**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| SAM, Inc., *et al.*, | |
| *Petitioners*, | |
| v. | Nos. 26-1106, 26-1130, 26-1136 |
| Department of Justice, *et al.*, | |
| *Respondents*. | |

**MOTION OF MEDPHARM IOWA, LLC, D/B/A BUD & MARY'S AND TRI-MOUNTAIN PURE, LLC FOR LEAVE TO INTERVENE IN SUPPORT OF RESPONDENTS**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27 and District of Columbia Circuit Rules 15(b) and 27, MedPharm Iowa, LLC, d/b/a Bud & Mary's, and Tri-Mountain Pure, LLC ("Intervenors"), move for leave to intervene as party respondents in these consolidated cases. The petitions for review challenge an April 28, 2026 rescheduling final order under the Controlled Substances Act. The final order places two kinds of marijuana within schedule III of the Act: marijuana in a Food and Drug Administration ("FDA") approved product and marijuana that is subject to a state medical marijuana license. Schedules of Controlled Substances:

1

Rescheduling of Food and Drug Administration Approved Products Containing Marijuana From Schedule I to Schedule III; Corresponding Change to Permit Requirements, 91 Fed. Reg. 22714, 22722-23 (Apr. 28, 2026). It also establishes an expedited path to registration with the Drug Enforcement Administration ("DEA") for state-licensed medical marijuana operators. *Id.* at 22721-22.

Intervenors are state-licensed medical marijuana companies that have applied for registration under the final order's expedited registration system. Because they would be directly harmed by a decision from this Court granting the petitions for review and setting aside or staying the final order and because no party adequately represents their interests, this Court should grant the motion.

## BACKGROUND

Petitioners challenge an April 28, 2026, final order of the Department of Justice ("DOJ") transferring marijuana in an FDA-approved drug product or subject to a state medical marijuana license from schedule I to schedule III of the Controlled Substances Act. 91 Fed. Reg. 22714, 22722-23. The same final order also establishes an expedited registration process under 21 C.F.R. part 1301 for entities holding state medical marijuana licenses, enabling such entities to engage in the manufacture, distribution, and/or dispensing of marijuana for medical purposes under federal law. *Id.* at 22721-22.

Intervenors are two such entities that operate in medical-marijuana-only states. Bud & Mary's is an Iowa-licensed medical-only marijuana manufacturer, distributor, and dispenser. Declaration of Lucas Nelson ("Nelson Declaration") ¶ 2 (June 29, 2026) [attached as Exhibit A]. A multi-generational family-owned business, the company prioritizes local sourcing and is dedicated to pushing the boundaries of innovation through cannabis research. In response to DOJ's final order, on June 25, 2026, Bud & Mary's submitted four applications to DEA seeking registration to manufacture, distribute, and dispense their schedule III state-licensed medical-marijuana products. *Id.* ¶¶ 3. Bud & Mary's paid over $7,000 in non-refundable application fees for the opportunity to register with DEA. *Id.*

Tri-Mountain Pure, LLC is a Pennsylvania-based medical marijuana company that cultivates, processes, manufactures, and dispenses medical marijuana products to registered patients and caregivers under Pennsylvania law. Declaration of Gabriel Perlow ("Perlow Declaration) ¶ 3 (June 29, 2026) [attached as Exhibit B]. The company provides patients throughout the Commonwealth with safe, high-quality, laboratory-tested medical marijuana products through a fully integrated cultivation, processing, manufacturing, and dispensary operation. *Id.*

Tri-Mountain Pure's founders and leadership team are experienced marijuana industry professionals with decades of combined experience in regulated cannabis operations, compliance, cultivation, manufacturing, and healthcare-related

3

regulatory matters. *Id.* ¶ 4. Recognizing the need for a patient-focused operator committed to pharmaceutical-quality manufacturing standards, regulatory compliance, and consistent product quality, Tri-Mountain Pure has invested millions of dollars in developing highly regulated cultivation, processing, manufacturing, and retail operations in Pennsylvania. *Id.* ¶ 5. The company has built facilities, hired and trained employees, implemented extensive compliance systems, and developed proprietary products to serve registered Pennsylvania medical marijuana patients. *Id.* Tri-Mountain Pure conducts every aspect of its operations under the oversight of the Pennsylvania Department of Health, Bureau of Medical Marijuana, and in accordance with Pennsylvania law. *Id.*

Tri-Mountain Pure currently holds a Pennsylvania medical marijuana grower/processor permit and a Pennsylvania medical marijuana dispensary permit, which authorizes three dispensary locations. *Id.* ¶ 6. Through those permits, Tri-Mountain Pure operates as a vertically integrated Pennsylvania medical marijuana company. *Id.* ¶ 7. It cultivates medical marijuana, manufactures finished medical marijuana products, and dispenses those products directly to registered Pennsylvania medical marijuana patients and caregivers. *Id.*

Tri-Mountain Pure's product portfolio includes regulated medical marijuana products, including flower, vape cartridges, concentrates, edibles, topicals, oral formulations, and other processed medical cannabis products approved by the

4

Pennsylvania Department of Health. *Id.* ¶ 8. Its customers consist exclusively of Pennsylvania medical marijuana patients and registered caregivers authorized under Pennsylvania law. *Id.* ¶ 9.

Following DOJ's issuance of the final order placing state-licensed medical marijuana in schedule III, Tri-Mountain Pure undertook significant business planning and compliance efforts in reliance on the final order remaining in effect, including submitting an application to DEA for a marijuana dispensary registration on June 9, 2026, and paying a non-refundable application fee of $794 on June 12, 2026. *Id.* ¶ 10.

Tri-Mountain Pure has also devoted substantial executive time, professional resources, and operational attention to preparing for participation in a federally regulated schedule III marketplace. *Id.* ¶ 11. Among other things, the company has evaluated DEA registration requirements, assessed federal compliance obligations, begun modifying internal compliance programs, reviewed manufacturing and handling protocols, and prepared its facilities for anticipated DEA regulatory requirements and inspections. *Id.*

Those preparations build on investments Tri-Mountain Pure has already made in highly regulated operations, including enhanced security and vault measures, strict standard operating procedures, OSHA and cGMP-based quality systems compliance systems compliance systems, product-handling protocols, and

transportation procedures designed to support compliant medical marijuana operations. *Id.* ¶ 12. Tri-Mountain Pure undertook those efforts in reliance on the continued effectiveness of DOJ's final order. *Id.* ¶ 13.

Before the final order, because Intervenors' products qualified as schedule I substances under the Controlled Substances Act, their operations were subject to harsh tax treatment under § 280E of the Internal Revenue Code. Nelson Declaration ¶ 4; Perlow Declaration ¶ 14. By transferring their products to schedule III, the final order removed Intervenors' operations from § 280E's ambit, providing them with an immediate and substantial economic benefit. Nelson Declaration ¶ 5; Perlow Declaration ¶ 14.

## ARGUMENT

### I.    Intervenors meet the standard for intervention.

Federal Rule of Appellate Procedure 15(d) and Circuit Rule 15(b) establish procedural requirements for intervention on appeal, including that a motion for leave to intervene must be filed within thirty days after the petition for review is filed and be served on all parties. For the substantive requirements, this Court has "held that intervention in the court of appeals is governed by the same standards as in the district court." *Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) (emphasis omitted). Thus, a party has a right to intervene if it "claims an interest relating to the … transaction that is the subject of

6

the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Intervenors satisfy this standard.

### A.    The motion is timely.

Federal Rule of Appellate Procedure 15(d) requires that a motion for leave to intervene "be filed within 30 days after the petition for review is filed." Fed. R. App. P. 15(d). D.C. Circuit Rule 15(b) addresses the effect of a motion for leave to intervene in one of several cases challenging the same agency action and makes clear that a motion filed in one of the cases "will be deemed a motion to intervene in all cases before this court involving the same agency action or order . . .  and an order granting such motion has the effect of granting intervention in all such cases." D.C. Cir. R. 15(b).

The first petition challenging the final order was filed on May 4, 2026, and the last was filed on May 28, 2026. Pet. Review, *Sam, Inc. v. DOJ*, No. 26-1106 (D.C. Cir. May 4, 2026); Pet. Review, *New Directions Addiction Recovery Servs. v. Trump*, No. 26-1136 (D.C. Cir. May 28, 2026). Thirty days after the May 28, 2026 petition was Saturday, June 27, 2026, so the filing deadline runs to Monday, June 29, 2026—the date of this filing—meaning the motion is timely. *See* Fed. R. App. P. 26(a)(1)(C). And because the consolidated petitions all challenge the same final

order, this Court's Rules dictate that this motion is deemed a motion to intervene in each consolidated case. *See* D.C. Cir. R. 15(b).

In any event, this motion is timely because Intervenors have filed it within a reasonable time. This Court has found it "not difficult at all" to find a motion to intervene timely when filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer." *Virginia v. Ferriero*, 466 F. Supp. 3d 253, 256 (D.D.C. 2020) (quoting *Fund for Animals*, 322 F.3d at 734-35); *see also, e.g.*, *Cnty. of San Miguel v. MacDonald*, 244 F.R.D. 36, 38, 46-48 (D.D.C. 2007) (granting motion to intervene filed more than 90 days after the complaint); *Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 35, 36 n.6, 43 (D.D.C. 2012) (granting motion to intervene filed more than 60 days after the complaint). Currently, no party challenging the final order has filed anything beyond standard procedural submissions, and Intervenors' participation will cause neither delay nor prejudice to any party. Intervenors' motion is therefore timely. *See United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980) (timeliness assessed by time elapsed, purpose of intervention, need to preserve rights, and probability of prejudice).

**B.    The disposition of these cases could impair Intervenors' strong interest in the final order and the expedited registration process it established.**

If this Court were to hold unlawful and set aside or stay DOJ's final order, Intervenors would be harmed in at least five ways. *See* Nelson Declaration ¶¶ 6-17; Perlow Declaration ¶¶ 15-26.

***First***, DOJ has acknowledged that, as a consequence of the final order, "state licensees will no longer be subject to the deduction disallowance imposed by Section 280E of the Internal Revenue Code, which applies only to businesses engaged in 'trafficking in controlled substances ... in a schedule I or II.'" 91 Fed. Reg. at 22719 (quoting 26 U.S.C. § 280E). Intervenors are state-licensed medical marijuana operators and thus benefit directly from the final order's removal of state-licensed medical marijuana from the ambit of § 280E. *See* Nelson Declaration ¶ 2, 4-6; Perlow Declaration ¶¶ 6-7, 14-15. Consequently, a decision by this Court in favor of petitioners would subject Intervenors' operations to § 280E's harsh tax penalty resulting in direct economic harm. Nelson Declaration ¶ 6; Perlow Declaration ¶ 15.

***Second***, if the petitions for review succeed, Intervenors will lose the benefit of their pending DEA registration applications and the business planning they have undertaken in reliance on the final order. Nelson Declaration ¶ 7-8; Perlow Declaration ¶¶ 16-17. Returning marijuana to schedule I would prevent Intervenors from obtaining DEA registrations that would otherwise allow them to participate in

9

federally regulated schedule III medical-marijuana activities. The companies would be forced to postpone or abandon planned initiatives, absorb sunk compliance costs, and continue operating under the significant legal and commercial burdens associated with schedule I status. Nelson Declaration ¶ 8; Perlow Declaration ¶ 17.

*Third*, returning state-licensed medical marijuana to schedule I would impose research-related burdens that directly affect Intervenors' business and patients. Nelson Declaration ¶¶ 9-11; Perlow Declaration ¶¶ 18-20. The classification restricts clinical research, physician collaboration, university partnerships, product development, collection of medical efficacy data, patient access to insurance reimbursement, and participation in state and federal grant programs. Nelson Declaration ¶ 9; Perlow Declaration ¶ 18. Those restrictions impair innovation and prevent the development of new therapies for the Iowa and Pennsylvania patients Intervenors serve. Nelson Declaration ¶¶ 10-11; Perlow Declaration ¶¶ 19-20.

*Fourth*, returning state-licensed medical marijuana to schedule I would harm Intervenors' ordinary commercial relationships. Nelson Declaration ¶¶ 12-15; Perlow Declaration ¶¶ 21-23. Although banking access has improved in some respects, marijuana's schedule I status has made many financial institutions, insurers, payment processors, lenders, secure-cash transporters, investors, and commercial vendors unwilling to work with state-licensed marijuana companies, including Intervenors, or willing to do so only at substantially increased cost. Nelson

Declaration ¶ 12; Perlow Declaration ¶ 21. Schedule I status also limits access to national vendors that provide laboratory equipment, pharmaceutical manufacturing systems, software, logistics services, financing, and other business-critical goods and services. Nelson Declaration ¶ 12; Perlow Declaration ¶ 21.

*Fifth*, returning state-licensed medical marijuana to schedule I would impair Intervenors' ability to recruit and retain specialized personnel. Nelson Declaration ¶¶ 15-17; Perlow Declaration ¶¶ 24-26. Highly qualified scientists, pharmacists, physicians, executives, and other professionals are often reluctant to work for a schedule I marijuana business because of perceived federal legal risks and professional-licensing concerns. Nelson Declaration ¶ 15; Perlow Declaration ¶ 24. That limits Intervenors' ability to attract the talent necessary to expand and improve their patient-focused medical marijuana operations. Nelson Declaration ¶ 15; Perlow Declaration ¶ 24.

Accordingly, Intervenors are not merely bystanders to this litigation. They are state-licensed medical-marijuana operators that have invested substantial resources in reliance on DOJ's final order, have applied for DEA registration in the wake of that final order, and will suffer direct economic, regulatory, and operational harm if petitioners succeed in vacating or delaying the final order. Intervenors therefore have a concrete interest in intervening to defend DOJ's final order.

### C.    No other party will adequately represent Intervenors' interest.

This may be Intervenors' only opportunity to refute petitioners' claims and protect DOJ's final order transferring state-licensed medical marijuana to schedule III. And no other party will adequately represent Intervenors' interests. "The requirement of [Rule 24] is satisfied if the [movant] shows that representation of [its] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *see also Berger v. North Carolina State Conf. of NAACP*, 597 U.S. 179, 195 (2022) (requirement "present[s] proposed intervenors with only a minimal challenge"). This requirement thus precludes intervention only if "it is clear that the party will provide adequate representation." *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) (cleaned up).

Although Intervenors seek to intervene in support of DOJ, as a government agency, DOJ will necessarily focus its defenses on its own institutional interests and duties. DOJ therefore cannot adequately represent Intervenors' private commercial interests. *See id.* ("[W]e look skeptically on government entities serving as adequate advocates for private parties."); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736-37 (D.C. Cir. 2003); *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977). *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986) ("A government entity . . . is charged by law with representing the public interest of its

citizens. . . . [It] would be shirking its duty were it to advance th[e] narrower interest [of a business concern] at the expense of its representation of the general public interest.").

Unlike DOJ, Intervenors have a specific, focused interest in the transfer of their products to schedule III and the opportunity to register with DEA to ensure their operations do not violate the Controlled Substances Act. This Court has recognized that, "[e]ven when the interests of [the federal government] and [intervenors] can be expected to coincide, . . . that does not necessarily mean that adequacy of representation is ensured." *Costle*, 561 F.2d 904 at 912. In *Costle*, after manufacturers had sought unsuccessfully to intervene in the district court in support of EPA, this Court on appeal reversed the denial of intervention. In light of the fact that the companies' interests were narrower than EPA's and were "concerned primarily with the regulation that affects their industries," the Court concluded that the companies' "participation in defense of EPA decisions that accord with their interest may also be likely to serve as a vigorous and helpful supplement to EPA's defense." *Id.* at 912-13 (emphasis omitted). The unique perspective Intervenors bring to these cases will likewise supplement DOJ's position.

In sum, the existing parties do not and cannot adequately represent Intervenors' interests in these cases.

**II.    To the extent Article III standing requirements apply, Intervenors meet the standard.**

This Court has explained that "intervenors seeking relief broader than or different from that sought by existing parties must possess constitutional standing, but intervenors that seek the same relief sought by at least one existing party need not do so." *Inst. S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 (D.C. Cir. 2025) (cleaned up). Because Intervenors seek the same relief as the federal government, they need not possess constitutional standing. *Id.* (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (explaining that the circuit court "erred by inquiring into [intervenors'] independent Article III standing" when they sought the same relief as the federal government, which "clearly had standing")). But even assuming Article III standing requirements apply, Intervenors easily meet the standard.

As already discussed, the final order bears directly on Intervenors' economic and business interests. *See supra* Part I.B. It removes their operations from the ambit of § 280E's harsh tax penalty, reduces federal restrictions on the products they sell by transferring them from schedule I to schedule III, and permits them to bring their operations into compliance with the Controlled Substances Act by registering with DEA. *See* 91 Fed. Reg. at 22721-23; *see also supra* Part I.B. Where, as here, a party is the object of the agency action under review, its standing is generally beyond question. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) ("[T]here is

ordinarily little question that the action or inaction has caused [parties subject to government regulation] injury."). As this Court put it recently, "[t]he 'threatened loss' of [a] favorable action [by an agency] constitutes a 'concrete and imminent injury'" justifying intervention of right to defend that action, satisfying not only the injury requirement but the causation and redressability requirements of Article III. Order, *New York v. EPA*, No. 17-1273 (D.C. Cir. Mar. 14, 2018) (ECF No. 1722115) (quoting *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003), *abrogated on other grounds by Inst. S'holder Servs., Inc.*, 142 F.4th at 757; *see also IGas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1135 n.3 (D.C. Cir. 2025) ("Because the Intervenors are both trade associations whose members are regulated HFC importers and producers, they have associational standing.") (citations omitted). The consolidated petitions pose precisely that sort of "threatened loss." To the extent Article III standing requirements apply, Intervenors satisfy them.

## CONCLUSION

For the foregoing reasons, the Court should grant Intervenors' motion. In the event that this Court denies Intervenors' motion, Intervenors request leave to participate as amici curiae.

Respectfully submitted,

/s/ *Shane Pennington*
Shane Pennington
Blank Rome LLP
717 Texas Ave., Suite 1400
Houston, TX 77002

June 29, 2026

# Exhibit A

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

SAM, Inc., *et al.*,

                    *Petitioners*,

        v.                                              Nos. 26-1106,
                                                              26-1130,
                                                              26-1136
Department of Justice, *et al.*,

                    *Respondents*.

**DECLARATION OF LUCAS NELSON**

1.      My name is Lucas Nelson. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of MedPharm Iowa, LLC, d/b/a Bud & Mary's in the above-captioned matter.

2.      I serve as the President of MedPharm Iowa, LLC. MedPharm Iowa, LLC is an Iowa-licensed, medical-only marijuana manufacturer, distributor, and dispenser.

3.      In response to DOJ's final order, on June 25, 2026, MedPharm Iowa, LLC submitted four applications to DEA seeking registration to manufacture, distribute, and dispense their schedule III state-licensed medical-marijuana products.

MedPharm Iowa, LLC paid over $7,000 in non-refundable application fees for the opportunity to register with DEA.

4. Before the final order, because MedPharm Iowa, LLC's products qualified as schedule I substances under the Controlled Substances Act, the company's operations were subject to harsh tax treatment under § 280E of the Internal Revenue Code.

5. By transferring the state-licensed medical-marijuana products the company sells to schedule III, the final order removed MedPharm Iowa, LLC's operations from § 280E's ambit, resulting in an immediate and substantial economic benefit for the company.

6. If petitioners succeed in having the final order held unlawful or set aside, MedPharm Iowa, LLC's products would return to schedule I of the Controlled Substances Act, and the company's operations would once again be subject to harsh tax treatment under § 280E of the Internal Revenue Code—a direct and significant economic harm to MedPharm Iowa, LLC.

7. If the petitions for review succeed, MedPharm Iowa, LLC will lose the benefit of its pending DEA registration applications and the business planning the company has undertaken in reliance on the final order.

8. MedPharm Iowa, LLC expects that returning marijuana to schedule I would prevent MedPharm Iowa, LLC from obtaining DEA registrations that would

otherwise allow the company to participate in federally regulated schedule III medical-marijuana activities in compliance with the Controlled Substances Act. MedPharm Iowa, LLC would be forced to postpone or abandon planned initiatives, absorb sunk compliance costs, and continue operating under the significant legal and commercial burdens associated with schedule I status.

9.    In my experience operating a state-licensed medical marijuana business, marijuana's longstanding schedule I classification has restricted clinical research, physician collaboration, university partnerships, product development, collection of medical efficacy data, patient access to insurance reimbursement, and participation in state and federal grant programs.

10.    Those restrictions impaired innovation and prevented the development of new therapies for the Iowa patients MedPharm Iowa, LLC serves.

11.    If petitioners succeed in returning state-licensed medical marijuana to schedule I, MedPharm Iowa, LLC expects that its products would once again be subject to research-related burdens that directly affect the company's business and customers.

12.    Returning state-licensed medical marijuana to schedule I would harm MedPharm Iowa, LLC's ordinary commercial relationships. In my experience, marijuana's schedule I status often made financial institutions, insurers, payment processors, lenders, secure-cash transporters, investors, and commercial vendors

either unwilling to work with the company or willing to do so only at substantially increased cost. State-licensed medical marijuana's schedule I status also limited access to national vendors that provide laboratory equipment, pharmaceutical manufacturing systems, software, logistics services, financing, and other business-critical goods and services.

13.    MedPharm Iowa, LLC expects that by transferring the company's products to schedule III, the final order will result in a significantly reduce the costs and burdens associated with these harms that state-licensed medical-marijuana's schedule I status has caused.

14.    If petitioners succeed in vacating the final order, MedPharm Iowa LLC expects to lose these benefits.

15.    In my experience leading MedPharm Iowa, LLC before the final order transferred state-licensed medical marijuana to schedule III, the schedule I status of the company's products impaired MedPharm Iowa, LLC's ability to recruit and retain specialized personnel. In my experience, many highly qualified professionals who might otherwise have accepted important roles with the company were reluctant or unwilling to do so because the company's products were listed in schedule I, hampering MedPharm Iowa, LLC's ability to attract the talent necessary to expand and improve its patient-focused medical-marijuana operations.

16. MedPharm Iowa, LLC expects the final order to reduce these schedule I-related burdens, resulting in a benefit to the company and its customers.

17. If petitioners succeed in having the final order vacated, MedPharm Iowa, LLC expects to lose these benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on my personal knowledge and information prepared by MedPharm Iowa, LLC.

Executed on this 29th day of June 2026.

Lucas Nelson

# Exhibit B

**IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| SAM, Inc., *et al.*,<br><br>*Petitioners*,<br><br>v.<br><br>Department of Justice, *et al.*,<br><br>*Respondents.* | Nos. 26-1106,<br>26-1130,<br>26-1136 |

**DECLARATION OF GABRIEL PERLOW**

1.      My name is Gabriel Perlow. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of Tri-Mountain Pure, LLC in the above-captioned matter.

2.      I serve as the Manager and Operator of Tri-Mountain Pure, LLC.

3.      Tri-Mountain Pure, LLC is a Pennsylvania-based medical marijuana company that cultivates, processes, manufactures, and dispenses medical marijuana products to registered patients and caregivers under Pennsylvania law. The company provides patients throughout the Commonwealth with safe, high-quality, laboratory

tested medical marijuana products through a fully integrated cultivation, processing, manufacturing, and dispensary operation.

4.      Tri-Mountain Pure LLC's founders and leadership team are experienced marijuana industry professionals with decades of combined experience in regulated cannabis operations, compliance, cultivation, manufacturing, and healthcare-related regulatory matters.

5.      Tri-Mountain Pure LLC has invested millions of dollars in developing highly regulated cultivation, processing, manufacturing, and retail operations in Pennsylvania. The company has built facilities, hired and trained employees, implemented extensive compliance systems, and developed proprietary products to serve registered Pennsylvania medical marijuana patients.

6.      Tri-Mountain Pure LLC conducts every aspect of its operations under the oversight of the Pennsylvania Department of Health, Bureau of Medical Marijuana, and in accordance with Pennsylvania law.

7.      Tri-Mountain Pure LLC currently holds a Pennsylvania medical marijuana grower/processor permit and a Pennsylvania medical marijuana dispensary permit, which authorizes three dispensary locations. Through those permits, Tri-Mountain Pure LLC operates as a vertically integrated Pennsylvania medical marijuana company. It cultivates medical marijuana, manufactures finished medical marijuana products, and dispenses those products directly to registered

Pennsylvania medical marijuana patients and caregivers.

8.    Tri-Mountain Pure LLC's product portfolio includes regulated medical marijuana products, including flower, vape cartridges, concentrates, edibles, topicals, oral formulations, and other processed medical cannabis products approved by the Pennsylvania Department of Health.

9.    Tri-Mountain Pure LLC's customers consist exclusively of Pennsylvania medical marijuana patients and registered caregivers authorized under Pennsylvania law.

10.    Following DOJ's issuance of the final order placing state-licensed medical marijuana in schedule III, Tri-Mountain Pure LLC undertook significant business planning and compliance efforts in reliance on the final order remaining in effect, including submitting an application to DEA for a marijuana dispensary registration on June 9, 2026, and paying a non-refundable application fee of $794 on June 12, 2026.

11.    Tri-Mountain Pure LLC has also devoted substantial executive time, professional resources, and operational attention to preparing for participation in a federally regulated schedule III marketplace. Among other things, the company has evaluated DEA registration requirements, assessed federal compliance obligations, began modifying internal compliance programs, reviewed manufacturing and

handling protocols, and prepared its facilities for anticipated DEA regulatory requirements and inspections.

12. Those preparations build on investments Tri-Mountain Pure LLC has already made in highly regulated operations, including enhanced security and vault measures, strict standard operating procedures, OSHA and cGMP-based quality systems compliance systems, product-handling protocols, and transportation procedures designed to support compliant medical marijuana operations.

13. Tri-Mountain Pure LLC undertook those efforts in reliance on the continued effectiveness of DOJ's final order.

14. By transferring the state-licensed medical-marijuana products the company sells to schedule III, the final order removed Tri-Mountain Pure LLC 's operations from the ambit of § 280E of the Internal Revenue Code, resulting in an immediate and substantial economic benefit for the company.

15. If petitioners succeed in having the final order held unlawful or set aside, Tri-Mountain Pure LLC's products would return to schedule I of the Controlled Substances Act, and the company's operations would once again be subject to harsh tax treatment under § 280E of the Internal Revenue Code—a direct and significant economic harm to Tri-Mountain Pure LLC.

16. If the petitions for review succeed, Tri-Mountain Pure LLC will lose the benefit of its pending DEA registration application and the business planning the company has undertaken in reliance on the final order.

17. Tri-Mountain Pure LLC expects that returning marijuana to schedule I would prevent Tri-Mountain Pure LLC from obtaining DEA registration that would otherwise allow the company to participate in federally regulated schedule III medical-marijuana activities in compliance with the Controlled Substances Act. Tri-Mountain Pure LLC would be forced to postpone or abandon planned initiatives, absorb sunk compliance costs, and continue operating under the significant legal and commercial burdens associated with schedule I status.

18. In my experience operating a state-licensed medical marijuana business, marijuana's longstanding schedule I classification has restricted clinical research, physician collaboration, university partnerships, product development, collection of medical efficacy data, patient access to insurance reimbursement, and participation in state and federal grant programs.

19. Those restrictions impaired innovation and prevented the development of new therapies for the Pennsylvania patients Tri-Mountain Pure LLC serves.

20. If petitioners succeed in returning state-licensed medical marijuana to schedule I, Tri-Mountain Pure LLC expects that its products would once again be

subject to research-related burdens that directly affect the company's business and customers.

21.    Returning state-licensed medical marijuana to schedule I would harm Tri-Mountain Pure LLC's ordinary commercial relationships. In my experience, marijuana's schedule I status often made financial institutions, insurers, payment processors, lenders, secure-cash transporters, investors, and commercial vendors either unwilling to work with the company or willing to do so only at substantially increased cost. State-licensed medical marijuana's schedule I status also limited access to national vendors that provide laboratory equipment, pharmaceutical manufacturing systems, software, logistics services, financing, and other business critical goods and services.

22.    Tri-Mountain Pure LLC expects that by transferring the company's products to schedule III, the final order is expected to significantly reduce the costs and burdens associated with these harms that state-licensed medical-marijuana's schedule I status has caused.

23.    If petitioners succeed in vacating the final order, Tri-Mountain Pure LLC expects to lose these benefits.

24.    In my experience serving as Tri-Mountain Pure's manager and operator before the final order transferred state-licensed medical marijuana to schedule III, the schedule I status of the company's products impaired Tri-Mountain Pure LLC's

ability to recruit and retain specialized personnel. In my experience, some highly qualified professionals who might otherwise have accepted important roles with the company were reluctant or unwilling to do so because the company's products were listed in schedule I, hampering Tri-Mountain Pure LLC's ability to attract the talent necessary to expand and improve its patient-focused medical-marijuana operations.

25.     Tri-Mountain Pure LLC expects the final order to reduce these schedule I-related burdens, resulting in a benefit to the company and its customers.

26.     If petitioners succeed in having the final order vacated, Tri-Mountain Pure LLC expects to lose these benefits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based upon my personal knowledge, including my review of Tri-Mountain Pure, LLC company records maintained in the ordinary course of business.

Executed on this 29th day of June 2026.

Gabriel Perlow

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, counsel for Proposed Defendant-Intervenors MedPharm Iowa, LLC, d/b/a Bud & Mary's, and Tri-Mountain Pure, LLC certify that they are limited liability companies based in Iowa and Pennsylvania, respectively. Counsel further certifies that the Proposed Defendant-Intervenors have no parent companies, and that no publicly held company owns 10% or more of either entity.

/s/ *Shane Pennington*
Shane Pennington

## CERTIFICATE OF PARTIES AND AMICI CURIAE

The undersigned certifies the following information regarding the parties in these consolidated petitions for review. D.C. Cir. R. 27(a)(4), 28(a)(1)(A).

In No. 26-1106, petitioners are SAM, Inc. and National Drug and Alcohol Screening Association, Inc. In No. 26-1130, petitioners are the states of Nebraska and Indiana. In No. 26-1136, petitioners are New Directions Addiction Recovery Services; Kenneth Finn; Elizabeth B. Stuyt; Cannabis Industry Victims Educating Litigators; MMJ International Holdings, Inc.; MMJ Biopharma Cultivation, Inc.; and MMJ Biopharma Labs, Inc.

Respondents in all cases are the Department of Justice; the Drug Enforcement Administration; Todd Blanche, in his official capacity as Acting Attorney General; and Terrance Cole, in his official capacity as Administrator of the Drug Enforcement Administration. In No. 26-1136, Donald J. Trump, in his official capacity as President of the United States, is also named as a respondent. There have been no amici or intervenors in this Court.

/s/ *Shane Pennington*
Shane Pennington

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies:

1.     This motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 3,142 words excluding the exempted portions, as provided in Federal Rule of Appellate Procedure 32(f). As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.     This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(a)(5)-(6) because it was prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ *Shane Pennington*
Shane Pennington

**CERTIFICATE OF SERVICE**

I certify that on this 29th day of June 2026, I filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

/s/ *Shane Pennington*
Shane Pennington