No. 26-1106 c/w 26-1136

# In the United States Court of Appeals for the District of Columbia Circuit

SAM, INC. and NATIONAL DRUG AND ALCOHOL SCREENING ASSOCIATION, INC.,
Petitioners,

v.

U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; DRUG ENFORCEMENT ADMINISTRATION; TERRANCE C. COLE, in his official capacity as Administrator of the Drug Enforcement Administration,
Respondents.

ON PETITION FOR REVIEW OF ATTORNEY GENERAL ORDER NO. 6754–2026

## BRIEF OF CANNABIS INDUSTRY ATTORNEYS AS *AMICI CURIAE* IN OPPOSITION TO MOTION FOR STAY PENDING REVIEW

J. GREGORY TROUTMAN*
TROUTMAN LAW OFFICE, PLLC.
4205 Springhurst Boulevard, Suite 201
Louisville, KY 40241
(502) 412-9179
jgtatty@yahoo.com
Attorney for Amici Curiae
*Attorney of Record.

**DISCLOSURE STATEMENT**

**NO. 26-1106**
**SAM, Inc.,** *et al.* **v. DOJ,** *et al.*

The undersigned counsel of record certifies that the following *Amici Curiae* are individuals who do not have a parent corporation and that thus no publicly held corporation owns 10 percent or more of their stock:

> David K. Sergi
> David C. Holland
> Robert Hoban
> Tyson Daniel

Dated: July 1, 2026

> /s/ J. Gregory Troutman
> J. GREGORY TROUTMAN
> *Attorney for Amici Curiae*

TABLE OF CONTENTS

DISCLOSURE STATEMENT…………………………………………………i

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES.................................................................. ivv

INTERESTS OF *AMICI CURIAE*...........................................................1

INTRODUCTION..................................................................................1

SUMMARY OF ARGUMENT ................................................................2

BACKGROUND....................................................................................4

    A.   THE CSA AND ITS SCHEDULING FRAMEWORK .................................4

    B.   THE SINGLE CONVENTION AND ITS RELATIONSHIP TO THE CSA.......5

    C.   MARIJUANA'S PLACEMENT IN CSA SCHEDULE I .............................6

    D.   THE ORDER.................................................................................8

ARGUMENT.......................................................................................8

    I.   PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS: THE ATTORNEY GENERAL ACTED WITHIN HIS STATUTORY AUTHORITY UNDER 21 U.S.C. § 811(D)(1).........................................................8

        A.  SECTION 811(D)(1) TREATY-COMPLIANCE SCHEDULING AUTHORITY PREVAILS OVER THE § 811(A)-(B) RULEMAKING PROCESS. ...................................................................9

        B.  THE SINGLE CONVENTION DOES NOT PROHIBIT A SCHEDULE III CLASSIFICATION.....................................................12

        C.  THE LIMITED SCOPE OF THE ORDER IS A VALID EXERCISE OF THE ATTORNEY GENERAL'S DISCRETION.........................................13

II.  PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS: THE ORDER DOES NOT VIOLATE THE APA'S NOTICE-AND-COMMENT REQUIREMENTS AND IS NEITHER ARBITRARY NOR CAPRICIOUS. ....14

   A.  APA NOTICE-AND-COMMENT RULEMAKING DOES NOT APPLY TO THE § 811(D)(1) TREATY-IMPLEMENTATION PATHWAY..............15

   B.  THE ORDER IS NEITHER ARBITRARY NOR CAPRICIOUS EVEN UNDER APA RATIONALITY REVIEW. ..........................................16

III. PETITIONERS WILL SUFFER NO IRREPARABLE INJURY WHICH WARRANTS A STAY. .......................................................................19

IV.  A STAY WOULD SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES. ................................................................................20

V.   THE PUBLIC INTEREST DISFAVORS A STAY. ...................................22

CONCLUSION .........................................................................................23

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS...................................23

CERTIFICATE OF CONFERENCE ................................................................24

CERTIFICATE OF SERVICE........................................................................24

APPENDIX.............................................................................................26

## TABLE OF AUTHORITIES

CASES:

*Alliance for Cannabis Therapeutics v. DEA,*
    15 F.3d 1131 (D.C. Cir. 1994) ........................................................7

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ....................................................................18

*Motor Vehicle Manufacturers Association v. State Farm Mutual*
    *Automobile Insurance Co.,*
    463 U.S. 29 (1983) .....................................................................16

*NORML v. Drug Enforcement Admin.,*
    559 F.2d 735 (D.C. Cir. 1977) ...........................................11, 12, 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ..............................................................2, 9, 19, 22

*Perez v. Mortgage Bankers Association,*
    575 U.S. 92 (2015) .....................................................................15

*SEC v. Chenery,*
    332 U.S. 194 (1947) ...................................................................10

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ...................................................................16

STATUTES:

Administrative Procedure Act, PUB. L. 79-404 (Jun. 11, 1946), 5 U.S.C. §
500 *et seq.* ...........................................................3, 9, 14, 15, 16
    § 553(a)(1)............................................................................15
    § 553(b)................................................................................14
    § 706(2)(A)............................................................................16

**STATUTES—CONTINUED:**

Controlled Substances Act, PUB. L. 91-513 (Oct. 27, 1970), 21 U.S.C. §
    801 *et. seq.* ………………..………1, 2, 3, 4, 5, 6, 8, 9, 10, 15, 16, 18, 20, 21
       § 801a…………………………………………………………….................5
       § 811 ……………………………….............2, 4, 8, 9, 10, 11, 12, 13, 15, 16
       § 812……………………………………………………………… 4, 7, 10

Internal Revenue Code, PUB. L. 99-514 (Oct. 26, 1986),
    26 U.S.C. § 1 *et seq*……………………………………….……1, 3, 20
       § 162(a)……………………………………………………………20
       § 280E …………………………………………………………1, 3, 20

H.R. REP. NO. 91-1444 (Sept. 10, 1970)……………………..………6, 10

**REGULATIONS:**

91 FED. REG. 22,714 (Apr. 28, 2026) …………………….1, 10, 12, 14, 17, 18

83 FED. REG. 48,950 (Sept. 28, 2018) ………………………….......…….11

**RULES:**

FED. R. APP. P. 15(c) …………………………………………………24

FED. R. APP. P. 27(d)(2) ………………………………………………23

FED. R. APP. P. 27(d)(2)(A) …………………………………………23

FED. R. APP. P. 29(a)(2) ……………………………………….……1, 24

FED. R. APP. P. 29(a)(4)(E) …………………………………………1

FED. R. APP. P. 32(a)(5) …………………………………….…..…23

FED. R. APP. P. 32(a)(6) ………………………………………….…23

FED. R. APP. P. 32(f) ………………………………………………23

OTHER AUTHORITIES:

Baldwin, G., *et al.*, *Current Cannabis Use in the United States: Implications for Public Health Research*, AM. J. PUB. HEALTH 114(S8):S624-S627 (Nov. 2024)……………………………………………………………..….22

Han, B., *et al.*, *Medically recommended vs nonmedical cannabis use among US adults age 18–49 years*, *JAMA PSYCHIATRY*, 82(3):319-321 (Mar. 1, 2025); ………………………………………………………………..….22

Memorandum for DEA, from HHS, *Re: Basis for the Recommendation to Reschedule Marijuana to Schedule III of the Controlled Substances Act* (Aug. 29, 2023)……………………………………………….…….7

Office of Legal Counsel, *Memorandum Re: Questions Related to the Potential Rescheduling of Marijuana*, 45 Op. O.L.C. (Apr. 11, 2024) ......................................................................... 12

Piomelli, D., *et al., Regulatory Barriers to Research on Cannabis and Cannabinoids: A Proposed Path Forward*, CANNABIS AND CANNABINOID RESEARCH, 4(1):21-32 (MAR. 2019)……………………………………….…21

Richard Nixon, *The President's News Conference*, The American Presidency Project (May 1, 1971)…………………………………….…………6

Shafer Commission, *Marijuana: A Signal of Misunderstanding* (1972) ………………………………………………………………31, 32

Single Convention on Narcotic Drugs, 18 U.S.T. 1407 (Mar. 30, 1961)……………………………....2, 5, 8, 10, 12, 13, 14, 17, 18

## INTERESTS OF *AMICI CURIAE*

*Amici curiae*[1] are an unincorporated coalition of attorneys[2] who represent cannabis industry licensed cultivators, processors, and retailers. Any decision to stay the rescheduling of marijuana under the Controlled Substances Act (CSA), PUB. L. 91-513 (Oct. 27, 1970), codified as 21 U.S.C. § 801, *et seq.*, impacts their interests. They accordingly have a direct and substantial interest in the outcome of the subject stay motion because such outcome will negatively impact their clients in a way which produces irreparable harm. A stay will immediately subject clients to the specter of criminal prosecution, tax discrimination under 26 U.S.C. § 280E and compromise their banking relationships.

## INTRODUCTION

The Petitioners ask this Court to stay the Attorney General's April 28, 2026 final order published in 91 FED. REG. 22,714 (Apr. 28, 2026). That Order was a long-overdue, scientifically grounded, and legally sound administrative action moved two limited subsets of marijuana products from CSA Schedule I to Schedule III. The Petitioners, however,

---

[1] Pursuant to FED. R. APP. P. 29(a)(2), counsel for *Amici Curiae* states that Petitioners and Respondents have articulated their consent to the filing of this brief. Pursuant to FED. R. APP. P. 29(a)(4)(E), counsel states that no party nor their counsel authored this brief in whole or part and that neither made a monetary contribution toward its preparation.

[2] The names of *Amici Curiae* are listed in the Appendix. *See* A-1.

fail to articulate facts satisfying the standard warranting a stay pending review set forth in *Nken v. Holder*, 556 U.S. 418 (2009). This Court should deny the Petitioners' Motion.

## SUMMARY OF ARGUMENT

Petitioners cannot satisfy the *Nken* factors that govern a stay pending review: (1) a strong showing that they are likely to succeed on the merits; (2) irreparable injury absent a stay; (3) the absence of substantial injury to other interested parties; and (4) that the public interest favors a stay. *Nken* at 434. Petitioners fail on each element.

*First*, the Petitioners fail to make a strong showing of their likelihood of success. The Order satisfies the requirements of 21 U.S.C. § 811(d)(1) and the United States' obligations under a key multi-lateral drug control treaty. Section 811(d)(1) is an exclusion from the standard notice-and-comment rulemaking procedures which the Petitioners claim were violated. The Single Convention on Narcotic Drugs (Single Convention), 18 U.S.T. 1407 (Mar. 30, 1961), of which the United States is a party, does not require that it maintain marijuana in CSA Schedule I. It requires only appropriate controls. The Order's well-structured Schedule III framework for medical and scientific uses fully satisfies those obligations.

*Second*, Petitioners likewise cannot show a likelihood of success because the Order is neither arbitrary nor capricious and rests on a robust evidentiary record. The Department of Health and Human Services' (HHS) August 2023 recommendation articulated a comprehensive medical and scientific evaluation that marijuana has abuse potential lower than CSA Schedule I and II substances. Further, decades of epidemiological and clinical research; and nearly three decades of states operating medical marijuana regulatory systems justify the Schedule III designation. The Attorney General satisfied the APA by considering relevant factors, exercising reasoned judgment, and explaining the basis for his decision.

*Third*, and most critically, Petitioners cannot show that they will be irreparably injured absent a stay. SAM, Inc. is an advocacy organization with ideological objections to rescheduling, and NDASA represents a screening industry that may see reduced demand. Neither can identify a concrete, legally cognizable injury sufficient to justify vacating a comprehensive administrative action affecting millions of people.

*Finally*, a stay would substantially injure other interested parties and the public interest disfavors one. Vacatur would reimpose the IRC § 280E tax discrimination, restore barriers to banking, impede clinical research, and harm the hundreds of thousands of patients who rely on medical

marijuana for qualifying conditions. The public interest, in turn, is served by an evidence-based scheduling regime that reflects scientific reality, not by perpetuating a determination untethered from it. The balance is not close.

## BACKGROUND

### A.   THE CSA AND ITS SCHEDULING FRAMEWORK

Congress enacted the CSA in 1970 to regulate controlled substances. The CSA establishes five schedules, differentiated by medical utility, abuse potential, and safety profile. Schedule I substances have

    (1)   "no currently accepted medical use in treatment in the United States,"

    (2)   a "high potential for abuse," and

    (3)   "a lack of accepted safety for use . . . under medical supervision."

21 U.S.C. § 812(b)(1). By contrast, Schedule III substances have "a currently accepted medical use in treatment in the United States," an "abuse potential . . . less than the drugs or other substances in schedules I or II," and a "moderate or low physical dependence or high psychological dependence." *IBID.* at § 812(b)(3).

The CSA establishes a standard scheduling pathway through 21 U.S.C. § 811(a)-(b). Such pathway requires the Attorney General (through the DEA Administrator) to gather data, obtain an HHS scientific and medical evaluation and conduct formal notice-and-

- 4 -

comment rulemaking. An alternative pathway, § 811(d)(1), exists when control is required by obligations under international treaties, conventions, or protocols in effect on October 27, 1970. Section 811(d)(1) requires the Attorney General to "issue an order" controlling substances under the schedule he deems most appropriate, "without regard to" the findings and procedures otherwise required by the CSA. The Attorney General rooted the Order in this second pathway.

### B.   THE SINGLE CONVENTION AND ITS RELATIONSHIP TO THE CSA

The United States acceded to the Single Convention and the Constitution's Supremacy Clause incorporated it into the supreme law of the land. U.S. CONST. ART. VI, CL. 2. Congress enacted the CSA in part to ensure Convention compliance, and multiple provisions directly reference and implement treaty obligations. *See* 21 U.S.C. § 801a.

Cannabis, its resins, extracts and tinctures are listed in Single Convention Schedule I. Signatories are obligated to implement a series of Schedule I control measures. *See* Single Convention, ARTS. 4, 19, 20, 21, 29, 30, 31, 33, 34. Critically, however, those schedules are not co-extensive with the CSA's schedules and does not require so. All it requires is substantive controls without prescribing a particular scheduling category. This distinction is central here.

## C.    MARIJUANA'S PLACEMENT IN CSA SCHEDULE I

Congress temporarily placed marijuana in CSA Schedule I pending completion of a comprehensive review by the National Commission on Marihuana and Drug Abuse (Shafer Commission).[3] The CSA's legislative history shows the Schedule I placement was a non-scientific provisional placeholder because Congress lacked sufficient information to make a final scheduling determination and looked to the Shafer Commission to do so. *See* H.R. REP. NO. 91-1444, at 36 (Sept. 10, 1970).

The Commission's 1972 report entitled "*Marijuana: A Signal of Misunderstanding*" recommended that marijuana neither be classified in CSA Schedule I nor adult personal use criminalized. The Commission found the available evidence did not support a conclusion that marijuana presented the level of danger or lack of medical utility associated with CSA Schedule I. The Nixon Administration arbitrarily announced its contra position ahead of the Shafer Commission report and declined to implement its recommendation.[4]

The ensuing five decades saw multiple petitions to reschedule marijuana. The 1988 opinion by an administrative law judge in *In the*

---

[3] The Commission was named after its chair, former Pennsylvania Governor Raymond Shafer.

[4] Richard Nixon, *The President's News Conference*, The American Presidency Project (May 1, 1971).

*Matter of Marijuana Rescheduling Petition*, No. 86-22 at 66 (Sept. 6, 1988) recommended rescheduling marijuana to Schedule II because it did not meet Schedule I criteria. The DEA Administrator rejected that recommendation, and this Court subsequently affirmed such decision. *See Alliance for Cannabis Therapeutics v. DEA*, 15 F.3d 1131 (D.C. Cir. 1994). Subsequent petitions in 2002 and 2016 were also rejected.

In August 2023, HHS transmitted to DEA a comprehensive medical and scientific evaluation recommending that marijuana be rescheduled to Schedule III.[5] That evaluation spanned hundreds of pages and analyzed epidemiological data, clinical research, pharmacological studies, and international regulatory experience. The HHS evaluation concluded that marijuana has a lower potential for abuse lower Schedule I and II substances and that its abuse may lead to moderate or low physical dependence.[6] HHS's findings directly correspond to the criteria for Schedule III placement under 21 U.S.C. § 812(b)(3).

---

[5] Memorandum for DEA, from HHS, *Re: Basis for the Recommendation to Reschedule Marijuana to Schedule III of the Controlled Substances Act* (Aug. 29, 2023) at 5. https://www.dea.gov/sites/default/files/2024-05/2016-17954-HHS.pdf

[6] *IBID.* at 1 − 2, 5.

### D.  THE ORDER

On April 22, 2026, the Acting Attorney General issued the Order to place in Schedule III: (1) all FDA-approved drug products containing marijuana as defined in 21 U.S.C. § 802(16) and (2) all products subject to state medical marijuana licenses. The Order expressly preserved CSA Schedule I status for unlicensed bulk marijuana and all marijuana not incorporated into the Schedule III designation.

The Order also amended DEA regulations to: (1) establish an expedited registration pathway for state-licensed medical marijuana entities; (2) require an import/export permit for the newly rescheduled substances (to maintain compliance with Single Convention, ART. 31); and (3) implement a nominal-price purchase-and-resale mechanism to comply with Articles 23 and 28. The Order was a proper exercise of the Attorney General's authority under the 21 U.S.C. § 811(d)(1) alternative scheduling pathway rather than through notice-and-comment rulemaking.

### ARGUMENT

### I.  PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS: THE ATTORNEY GENERAL ACTED WITHIN HIS STATUTORY AUTHORITY UNDER 21 U.S.C. § 811(D)(1).

A stay pending review is "an exercise of judicial discretion" governed by four factors: (1) whether the movant has made a strong showing that

it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken* at 426, 434. The first two factors are the most critical but the Petitioners cannot satisfy any of them.

They cannot make a strong showing of likely success because the Order was a lawful exercise of the Attorney General's statutory authority and complies with the APA and is neither arbitrary nor capricious. Nor can Petitioners show that they will be irreparably injured absent a stay, although a stay will substantially injure cannabis businesses, researchers, and patients, and the public interest in an evidence-based scheduling regime disfavors a stay.

A stay is not warranted because the Attorney General did not exceed his statutory authority by rescheduling marijuana using the § 811(d)(1) treaty-compliance pathway rather than the § 811(a)-(b) rulemaking process. The CSA's plain language, legislative history and established DEA practice do not support the Petitioners' position.

## A. SECTION 811(D)(1) TREATY-COMPLIANCE SCHEDULING AUTHORITY PREVAILS OVER THE § 811(A)-(B) RULEMAKING PROCESS.

The plain text of 21 U.S.C. § 811(d)(1) offers a statutory means of making scheduling decisions on grounds which differ from the standard

pathway. The statute provides that

> "[i]f control is required by United States obligations under international treaties, conventions, or protocols in effect on October 27, 1970, the Attorney General ***shall issue*** an order controlling such drug under the schedule he deems most appropriate to carry out such obligations, without regard to the findings required by [21 U.S.C. §§ 811(a) or 812(b)] and without regard to the procedures prescribed by [21 U.S.C. §§ 811(a) and (b)]." (Emphasis added.)

The statutory language is clear and unambiguous: rescheduling authority is mandatory ("shall issue") and is exercised by order rather than rulemaking. *SEC v. Chenery*, 332 U.S. 194 (1947) requires deference to the Attorney General's discretion because Congress delegated that choice.

The CSA's legislative history confirms that § 811(d)(1) authorizes the Attorney General to

> "include the drug or other substance under any of the five schedules of the bill which he considers most appropriate to carry out the obligations of the United States under the international instrument, and he may do so without making the specific findings otherwise required for inclusion of a drug or other substance in that schedule."

H.R. REP., *IBID*. at 36. This is precisely what the Order did—placing the subsets of covered marijuana products in Schedule III "to carry out" the United States' Single Convention obligations. 91 FED. REG. at 22,718.

DEA's own precedent further buttresses this interpretation. In 2018, DEA used the identical § 811(d)(1) authority to place FDA-approved drug products containing Cannabidiol (CBD) into Schedule V without notice-and-comment rulemaking. *See* 83 FED. REG. 48,950 (Sept. 28, 2018). The CBD rescheduling has stood unchallenged for nearly eight years. That settled practice, and the accompanying regulatory reliance interests, are entitled to substantial weight.

This Court's decision in *NORML v. DEA*, 559 F.2d 735 (D.C. Cir. 1977) interpreted § 811(d)(1) to require an HHS scientific and medical evaluation in certain circumstances. But it did not altogether foreclose the treaty-compliance pathway because the statutory text of § 811(d)(1) "is consistent with" a broad reading of treaty-based authority. *IBID.* at 746. This Court also observed that treaty obligations may require an HHS evaluation to inform a choice when a substance could be placed in more than one schedule. *IBID.* at 747. In other words, any rescheduling involves two inquiries: whether to reschedule and how to do so. Any HHS evaluation requirement only affects the second inquiry.

The first inquiry requires the Attorney General to consider treaty obligation questions. The Order shows that being satisfied. The second inquiry is likewise satisfied: HHS provided an evaluation in August 2023 required by § 811(d)(1), and the Attorney General selected Schedule III

- 11 -

in reliance on it. The Petitioners can hardly complain because the government did precisely what § 811(d)(1) required. *NORML* does not stand as an obstacle to upholding the Order.

### B. THE SINGLE CONVENTION DOES NOT PROHIBIT A SCHEDULE III CLASSIFICATION.

The Single Convention does not require the adoption of mirroring domestic scheduling nomenclature. It merely requires that signatories implement substantive control measures for Schedule I substances. The Order does precisely that—it carefully explained that moving FDA-approved and state-compliant medical marijuana products to Schedule III will not diminish the substantive controls while integrating them into a more comprehensive and workable federal regulatory framework.

The Order specifically addresses each of the United States' treaty obligations and demonstrates continued compliance." 91 FED. REG. at 22,718 – 22,722. A 2024 Office of Legal Counsel opinion concluded that several scheduling options existed—including Schedule III placement—that would satisfy treaty obligations.[7] The 2024 OLC opinion is entitled to substantial deference as an authoritative interpretation by the

---

[7] Office of Legal Counsel, *Memorandum Re: Questions Related to the Potential Rescheduling of Marijuana*, 45 Op. O.L.C. (Apr. 11, 2024).

- 12 -

executive branch's chief legal counsel of the United States'. international treaty obligations. *See generally Medellín v. Texas*, 552 U.S. 491 (2008) (recognizing executive branch's primary role in interpreting treaties).

Moreover, the Single Convention itself anticipates the need for flexibility in domestic implementation. Article 4 requires a limitation of production, manufacture, export/import, distribution, trade, use, and possession of Schedule I substances to "medical and scientific purposes." The Order's limitation of its scope to specific product subsets is explicitly calibrated to satisfy this requirement. The Order is narrow and only applies to those products subject to comprehensive medical and safety oversight—the exact category that Article 4's medical and scientific use carve-out contemplates.

### C.    THE LIMITED SCOPE OF THE ORDER IS A VALID EXERCISE OF THE ATTORNEY GENERAL'S DISCRETION.

Section 811(d)(1) is not an all-or-nothing proposition—it does not require the rescheduling of all marijuana or none of it. The plain statutory text grants the Attorney General authority to place a substance in "the schedule he deems most appropriate to carry out" the Single Convention's obligations. The singular use of "the schedule" means the schedule appropriate to carry out treaty obligations for a particular substance, not a single uniform schedule for all forms of a substance.

The Order offers a bifurcated approach that is a thoughtful and legally defensible implementation of the Single Convention's framework. Such approach preserves the Convention's quota and purchase-and-resale mechanisms required for raw cannabis crops while integrating the medically supervised portion of the market into a regulatory framework that promotes patient access, research, and commercial activity. This is the kind of reasoned, evidence-based distinction that the APA requires and rewards, not an arbitrary bureaucratic line-drawing.

The Attorney General's discretionary selection of Schedule III is also well-grounded. As the Order notes, Schedule III most closely aligns with the 2023 HHS evaluation and findings. 91 FED. REG. at 22,718. This evaluation concluded that marijuana has abuse potential less than Schedule I or II substances and may lead to moderate or low physical dependence or high psychological dependence, *IBID.* at 22,717, thus tracking the Schedule III definition. This alignment between scientific findings and regulatory outcome is precisely the kind of rational decision-making that negates the propriety of a stay.

## II. PETITIONERS ARE NOT LIKELY TO SUCCEED ON THE MERITS: THE ORDER DOES NOT VIOLATE THE APA'S NOTICE-AND-COMMENT REQUIREMENTS AND IS NEITHER ARBITRARY NOR CAPRICIOUS.

The APA defaults to requiring notice-and-comment rulemaking for substantive rules. 5 U.S.C. § 553(b). That default, however, but does not

apply when Congress specifically provides a different procedure for a particular type of agency action. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). That is precisely what Congress did in the CSA.

### A. APA NOTICE-AND-COMMENT RULEMAKING DOES NOT APPLY TO THE § 811(D)(1) TREATY-IMPLEMENTATION PATHWAY.

The APA expressly exempts "military or foreign affairs function[s]" from its rulemaking requirements. 5 U.S.C. § 553(a)(1). The Order is APA-exempt as a matter of treaty implementation—a core foreign affairs function. Even apart from such exemption, the plain text of § 811(d)(1) overrides the APA notice-and-comment requirements as a standalone statutory exception. Section 811(d)(1) not only authorizes proceeding by an order rather than a rule, it also specifically mandates that result by directing that an order be issued "without regard to the . . . procedures prescribed by [§§ 811(a) and (b)]."

Further, *NORML, supra.*, does not support a notice-and-comment requirement. Therein, this Court merely addressed a limited procedural question: whether the DEA was required to obtain an HHS evaluation before acting under § 811(d)(1); holding that such evaluation was appropriate when multiple schedules could satisfy treaty obligations. That was precisely the process followed here. *NORML* did not hold that APA notice-and-comment rulemaking is required for § 811(d)(1) orders.

The DEA's consistent practice confirms this interpretation. From the initial CSA scheduling in 1970 through the 2018 CBD rescheduling, the DEA has consistently treated § 811(d)(1) orders as exempt from notice-and-comment requirements. That longstanding agency interpretation is entitled to deference. *See United States v. Mead Corp.*, 533 U.S. 218 (2001).

### B.  THE ORDER IS NEITHER ARBITRARY NOR CAPRICIOUS EVEN UNDER APA RATIONALITY REVIEW.

Further, the Order easily satisfies APA rationality review. The APA requires that courts must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency

> "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). The Order satisfies this standard on every dimension.

*First*, the Order rests on a robust and extensive evidentiary record. The August 2023 HHS recommendation is a rigorous, multi-hundred-

page medical and scientific evaluation. It analyzed epidemiological data from the National Survey on Drug Use and Health; hospital emergency department visit rates; poison control center data; overdose mortality statistics; pharmacological research on Delta 9 THC; clinical studies on marijuana dependence; and international comparisons.[8] HHS concluded that marijuana's abuse potential is lower than Schedule I and II substances and that its abuse profile corresponds to Schedule III criteria.[9] This is not a thin or inadequate administrative record.

*Second*, the Attorney General considered the relevant statutory factors. The Order independently confirmed that HHS's findings corresponded thereto. The Order explains that marijuana has a currently accepted medical use (FDA has approved multiple marijuana-derived drug products and states have created comprehensive medical marijuana programs); that its abuse potential is lower than Schedule I or II substances; and that its abuse may lead to moderate or low physical dependence. 91 FED. REG. at 22,716 – 22,718; 22,720. These are the definitional hallmarks of a proper Schedule III placement.

*Third*, the Order addresses Single Convention compliance in detail, explaining with specificity how each applicable treaty obligation will be

---

[8] 91 FED. REG. at 22,717.

[9] *IBID.*

satisfied under the new regulatory framework. 91 FED. REG. at 22,715 – 22,719. A stay is not warranted because this kind of explanation satisfies the arbitrary-and-capricious standard because it makes a rational connection between the facts found and the choices made.

*Fourth*, the Order's limited scope is supported by specific and articulated reasons. The Order explains its limited scope serves the Single Convention, ART. 4 requirement to limit drug use to medical and scientific purposes, prevents disruption of its quota and purchase-and-resale mechanisms while reflecting the Attorney General's considered judgment that cooperative federalism best serves the CSA's statutory purposes. 91 FED. REg. at 22,720. These are relevant considerations, not improper ones—thus negating the propriety of a stay.

Petitioners cannot carry their burden of showing a substantial likelihood of prevailing. They cannot demonstrate that the Order is arbitrary and capricious simply because a different scheduling decision could have been made, or because they disagree with the Order's underlying scientific conclusions. The arbitrary-and-capricious standard does not permit a court to substitute its judgment for that of an agency on scientific or policy questions within its expertise. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Any need for a stay is negated because the Order provides a sufficiently rational explanation.

In sum, the Order's evidentiary foundation is robust, multi-layered, and satisfies the arbitrary-and-capricious standard. Petitioners cannot plausibly identify a specific piece of relevant evidence that the Attorney General failed to consider, a specific factor he improperly relied upon, or a specific finding that is so contrary to the record as to be irrational. Their disagreement with the outcome of the scientific evaluation is not a legal argument which warrants staying the Order's implementation.

### III. PETITIONERS WILL SUFFER NO IRREPARABLE INJURY WHICH WARRANTS A STAY.

The second and most critical *Nken* factor—irreparable injury to the movant—is dispositive against Petitioners, who fail to identify a sufficient comparable irreparable injury that would result from upholding the Order. SAM, Inc. is an advocacy organization with ideological objections to marijuana rescheduling. NDASA represents drug and alcohol screening industry members who may experience reduced demand for their services because of rescheduling. Neither organization, however, can stand on a concrete, legally cognizable injury that rises to the level required to justify vacating a comprehensive administrative action affecting millions of people.

## IV. A STAY WOULD SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES.

Further, the Court must weigh the equities when considering relief affecting ongoing regulatory action. Here, the equities overwhelmingly favor upholding the Order because the harm resulting from a vacatur would far outweigh it.

The immediate effect of a vacatur would be devastating to the industry segment benefitting by the Order. It would immediately:

1.   Restore the IRC § 280E disallowance: IRC § 162(a) (26 U.S.C. § 162) permits businesses to deduct "ordinary and necessary" business expenses. IRC § 280E, however, prohibits those deductions for businesses engaged in "trafficking in controlled substances . . . in a schedule I or II." Before the Order, state-licensed cannabis businesses could not avail themselves of IRC § 162(a). They could not deduct basic expenses like rent, utilities, insurance and employee compensation—taxing them on their gross profits. The Order, however, removed the § 280E restraints. Vacatur would reimpose this penalty on businesses and create confusion among taxpayers.

2.   Re-impose barriers to banking/financial services: A central consequence of CSA Schedule I classification was the *de facto* exclusion of cannabis businesses from the federal banking system. Federally-regulated financial institutions were historically reluctant to provide

- 20 -

services to cannabis businesses. Instead, these businesses were forced to operate predominantly in cash—creating serious security risks and imposing substantial operational burdens. The Order removed a significant legal obstacle to normalized banking relationships. Vacatur would require an immediate return to the pre-Order economic model.

3. <u>Impede clinical research</u>: CSA Schedule I classification imposed uniquely burdensome requirements on researchers seeking to study marijuana. They had to obtain a DEA Schedule I registration, procure substances from the limited pool of DEA-licensed Schedule I bulk manufacturers, and navigate security requirements calibrated for the most dangerous controlled substances.[10] These barriers historically made it difficult and expensive to conduct clinical research on marijuana's therapeutic potential. The Order meaningfully reduced these barriers while facilitating research that could benefit millions of patients.

4. <u>Perpetuate harm to marijuana-reliant patients</u>: Hundreds of thousands of patients across the nation rely on state-compliant medical marijuana for the treatment of cancer, chronic pain, epilepsy, multiple sclerosis, HIV/AIDS-related conditions, and other qualifying medical

---

[10] Piomelli, D., *et al., Regulatory Barriers to Research on Cannabis and Cannabinoids: A Proposed Path Forward*, CANNABIS AND CANNABINOID RESEARCH, 4(1):21-32 (MAR. 2019).

conditions.[11] These patients and their physicians have made treatment decisions based on a regulatory environment that includes the Order. Vacatur would not only harm the commercial ecosystem that serves these patients but would perpetuate the legal stigma and regulatory uncertainty that have complicated patient access to a therapeutic option that for many is superior to available alternatives.

## V.    THE PUBLIC INTEREST DISFAVORS A STAY.

Finally, the public interest also weighs heavily in favor of upholding the Order. The public interest is served by an evidence-based drug scheduling system that accurately reflects scientific knowledge about the relative dangers and therapeutic potential of controlled substances. A scheduling determination that is untethered from scientific reality wastes enforcement resources, harms patients, impedes research, and distorts markets. The Order moves the federal drug scheduling framework in the direction of scientific rationality. That is a public benefit, not a public harm.

The balance of equities analysis under *Nken* weighs each of these considerations. On one side: concrete economic harm to thousands of

---

[11] Han B, *et al., Medically recommended vs nonmedical cannabis use among US adults age 18–49 years*, JAMA PSYCHIATRY, 82(3):319-321 (Mar. 1, 2025); Baldwin, G., *et al., Current Cannabis Use in the United States: Implications for Public Health Research*, AM. J. PUB. HEALTH 114(S8):S624-S627 (Nov. 2024).

businesses; harm to patient access; impediment to research; and perpetuation of a regulatory error. On the other side: an advocacy organization's policy preferences and a screening industry's business interests. The balance is not close.

## CONCLUSION

For the foregoing reasons, the Court should deny the Petitioners' Motion for Stay Pending Review.

Dated: July 1, 2026

Respectfully submitted,

By:    */s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
TROUTMAN LAW OFFICE, PLLC.
4205 Springhurst Boulevard, Suite 201
Louisville, Kentucky 40241
(502) 412-9179
jgtatty@yahoo.com
*Attorney for Amici Curiae*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the word limit of FED. R. APP. P. 27(d)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and FED. R. APP. P. 27(d)(2), this document contains 4,454 words.

2.    This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, size 14.

*/s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
*Attorney for Amici Curiae*

- 23 -

CERTIFICATE OF CONFERENCE

I hereby certify under FED. R. APP. P. 29(a)(2) that on June 17, 2026, the undersigned contacted counsel for both the Petitioners and the Respondents by electronic mail seeking consent to file the subject amicus brief of *Amici Curiae* and that counsel for both Petitioners and Respondents (June 17, 2026) articulated their consent.

                    */s/ J. Gregory Troutman*
                    J. GREGORY TROUTMAN
                        *Attorney for Amici Curiae*


CERTIFICATE OF SERVICE

Pursuant to FED. R. APP. P. 15(c), I hereby certify that on July 1, 2026, true and correct copies of the foregoing **UNOPPOSED BRIEF OF CANNABIS INDUSTRY STAKEHOLDERS AS *AMICI CURIAE* IN OPPOSITION TO MOTION FOR STAY PENDING REVIEW** was filed with the Clerk's Office for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system and was served by electronic mail upon the following persons:

Patrick F. Philbin
Chase T. Harrington
TORRIDON LAW PLLC
801 Seventeenth Street NW
Suite 1100
Washington, DC 20006

Connor W. Mighell
Burke Law Group
1809 Pearl Street
Austin, TX 78701

Cody Barnett
Zachary B. Pohlman
Nebraska Department of Justice
1445 K Street, Suite 2115
Lincoln, NB 68508

McKaye L. Neumeister
Daniel Aguillar
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

*/s/ J. Gregory Troutman*
J. GREGORY TROUTMAN
*Attorney for Amici Curiae*

## **APPENDIX**

## Table of Contents

List of *Amici Curiae*…………………………………………………….......A-1

## LIST OF *AMICI CURIAE*

David K. Sergi
Sergi & Associates, P.C.
San Marcos, TX

David C. Holland
Holland Schrievner LLP
New York, NY

Robert Hoban
Denver, CO

Tyson Daniel
Roanoke, VA

A- 1